**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.** 5:14-CV-00182-RLV-DSC

| | | |
|---|---|---|
| MID-SOUTH INVESTMENTS, LLC**,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW, AND** |
| | ) | **JUDGMENT** |
| | ) | |
| STATESVILLE FLYING SERVICE, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

The present action was filed on November 10, 2014, and brought by Mid-South Investments, LLC ("Mid-South")[1] against Statesville Flying Service, Inc. ("SFS"). Mid-South asserts a bailment/negligence theory against SFS. SFS had admitted liability,[2] but disputes the amount of damages. SFS also asserts affirmative defenses and counterclaims for breach of contract/lien. (Doc. 22).

On May 17, 2016 this Court held a bench trial. The trial concluded on May18, 2016. After carefully considering all testimony and arguments presented at trial of this matter, and taking into account the credibility and accuracy of the testimony and other evidence, and studying the applicable law, this Court concludes that Plaintiff is entitled to judgment against Defendant in the amount of $112,000.00. Defendant is entitled to judgment in the amount of $9,000.00 with interest as prescribed by the decretal.

---

[1] This case was originally brought by Mid-South Investments, Inc.; however, the Court allowed substitution because the correct entity is a limited liability company and not a corporation.
[2] SFS never accepted a particular theory of liability.

## I.     FINDINGS OF FACT

The Court makes the following findings of fact by a preponderance of the evidence and under Rule 52 of the Federal Rules of Civil Procedure.[3]

1.     Mid-South is a limited liability company organized under the laws of Delaware.

2.     The sole member and officer of Mid-South is Barry Crabtree ("Crabtree").

3.     Mid-South was created to purchase an aircraft for Crabtree's business.

4.     Crabtree is in the business of purchasing equipment for re-sale.  Some ninety-five percent of his sales are in the United States; however, five percent are sold to persons or entities in foreign countries.

5.     Mid-South purchased a Falcon 50 Jet aircraft, N519EM (the "Falcon"), in late 2011.

6.     An exact date is not known because Mid-South has no documentation supporting the purchase.

7.     The Falcon is a French-built, mid-sized, long-ride, three-engine turbojet aircraft manufactured by Dassault Aviation.

8.     The Falcon was registered on March 30, 1980, and thus was over thirty years old on Plaintiff's date of purchase.

9.     Crabtree never purchased an aircraft before he purchased the Falcon.  Crabtree has no background in aviation and has no specialized knowledge with respect to aircraft.

10.     Crabtree researched prices for the Falcon 50 Jets online in order to find what he deemed to be the market value.  He believed the market value to be 1.2 to 1.4 million dollars.

11.     Crabtree purchased the subject Falcon for $550,000.00 from a bank in Florida.

12.     Crabtree did not inspect the Falcon prior to purchasing it.

---

[3] To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

13.     He believes he got a good deal on the Falcon because the bank had repossessed the Falcon and wanted to get it off the books.

14.     At the time of the purchase, the Falcon was in need of maintenance.  The Falcon had oil leaks when it was purchased.

15.     Crabtree's testimony and opinions about the value of the Falcon are not credible because he has no specialized knowledge with respect to aircraft.

16.     Crabtree's testimony on the significance of the damage sustained is not credible because he has no specialized knowledge with respect to aircraft.

17.     After purchasing the Falcon, Crabtree contracted with certain companies to perform maintenance on the Falcon.

18.     Mid-South attempted to fix the oil leaks while the Falcon was still in Florida.  The leaks were not repaired correctly

19.     A plane is a considered "airworthy" when it is compliant with the Federal Aviation Administration ("FAA") regulations.  A plane is prohibited from flying when it is not airworthy unless it receives a special flight permit.

20.     A person obtains a special flight permit, commonly known as a ferry permit, by applying to the FAA.  Ferry permits are heavily regulated.

21.     Mid-South does not have the entirety of the records for the Falcon.  For example, there are entries in the logbook that indicate that Modern Jet Solutions inspected or performed maintenance on the Falcon.  Even after the maintenance was finished, the record states that "[T]his aircraft is unairworthy and is not approved for return to service due to discrepancies found while performing the maintenance listed above. There are a number of inspections still overdue.  The owner has been

provided with a list of discrepancies and inspections." Mid-South no longer has a copy of these lists.

22.　　In Atlanta, the Falcon underwent additional inspections. Records show that the Falcon was declared airworthy after these inspections were finished. However, Art Thompson signed the work as an A&P mechanic.[4] A&P mechanics cannot, under the FAA, return an aircraft to an airworthy condition. Moreover, the entry itself, even without the licensure issue, is insufficient to return the aircraft to airworthiness because it does not contain the content to satisfy the FAA that the outstanding issues were corrected. Further, the entry itself references that "[d]etails are on file" pursuant to a work order, but no work order was found.

23.　　Failing to keep adequate records or document maintenance/inspections depresses an aircraft's value to potential buyers.

24.　　The Falcon was flown multiple times while it was unairworthy under the FAA, without a ferry permit.

25.　　Mid-South contracted with Renaissance Air, LLC ("Renaissance") to provide management of the aircraft in May of 2012.

26.　　Dale Clark is the operator/manager of Renaissance.

27.　　Clark was paid $4,000.00 a month to manage the aircraft, which included ensuring that it was properly maintained and received inspections in accordance with FAA requirements

28.　　Dale Clark lived in Mooresville, North Carolina (near Statesville) during 2012 to 2014.

29.　　In the summer of 2012, Renaissance, on behalf of Mid-South, contacted SFS regarding hangar storage.

---

[4] An A&P mechanic is a person who has an Airframe and Power Plant ("A&P") certificate issued by the FAA.

30.     SFS is a corporation organized under the laws of North Carolina with its principal place of business in Statesville, North Carolina.

31.     During all pertinent periods, SFS was a fixed base operator on the Statesville Regional Airport.

32.     Mid-South and SFS entered into the following oral agreement in 2012 concerning the Falcon

        a.      Mid-South pays $1,800.00 per month in exchange for an open-ended term for hangar space for the Falcon; and

        b.      SFS provides hangar space for the Falcon for an open-ended term in exchange for $1,800.00 monthly fee.

33.     This agreement, and all subsequent renewals of the agreement, concerned space in a hangar and not on the tarmac.

34.     No party assumed additional duties outside of those noted above.

35.     The Falcon only stayed in Statesville for a month during the summer of 2012.

36.     After this month, the Falcon was flown to Spain.

37.     As soon as the Falcon left Statesville, the arrangement with SFS terminated.

38.     The Falcon experienced mechanical issues while in Spain and eventually had to have the engine overhauled back in the United States.

39.     After the overhaul, the Falcon returned to Statesville.

40.     The Falcon then flew to Spain and Ghana.

41.     The arrangement with SFS terminated subject to revival each time the Falcon left Statesville for an indefinite period.

42.     The plane remained overseas for a period of six months because Mid-South agreed to lease the Falcon for $30,000.00 a month.

43.     Mid-South desired to lease the Falcon because it wanted to offset upcoming maintenance and inspection costs.

44.     While the lessee had the property for six months, it only paid a single monthly payment of $30,000.00.

45.     Mid-South returned the Falcon to Statesville on May 15, 2013 because the lease arrangement was a failed venture and the Falcon needed maintenance.

46.     After August 1, 2012, no maintenance was performed on the Falcon until April 2016.

47.     At this time, Crabtree believed the Falcon was worth 1.2 to 1.5 million dollars.  However, as stated above, Crabtree's valuation of the Falcon is not credible.

48.     On May 15, 2013, Mid-South and SFS re-entered into a contract whereby Mid-South would pay $1,800.00 for a monthly spot in SFS' hangar.

49.     Owners had the ability to access their aircraft in SFS' hangar without SFS' permission.  Owners could access their aircraft afterhours.  Owners were given the password to the keypad located on the aircraft hangar.

50.     SFS never had access to the keys to the Falcon.

51.     SFS does not provide owners with engine covers to cover their aircraft.

52.     SFS did not assume the responsibility to maintain the Falcon.

53.     On September 5, 2013, there were numerous overdue inspections due on the Falcon.  In fact, the Continuous Airworthiness Maintenance Program Report shows that the Falcon had past due maintenance and inspections dating as early as 2012.

54.     For example, the Falcon required a CPCP inspection which is a complex inspection which requires a significant amount of man-hours dissembling the aircraft to determine the extent of corrosion on an aircraft.

55.     The Falcon required a C inspection at this time, which is also a major inspection.

56.     In early September 2013, Renaissance/Clark decided that it was necessary to start and run the Falcon's engines in order to maintain it in accordance with the FAA regulations.

57.     Accordingly, on September 5, 2013, SFS began towing the Falcon outside of the hangar at Clark's instruction.  The vertical stabilizer impacted the hangar door during the tow.

58.     After the September 5, 2013 incident, Mid-South stopped making the required $1,800.00 monthly payments.

59.     An aircraft's value to prospective purchasers is reduced when it has damage history.

60.     After this impact, Mid-South contacted the Falcon's manufacturer, Dassault Falcon Jet, to have the damage assessed.  (Pl.'s Ex. 115).

61.     Dassault charged Mid-South $8,225.00 for the inspection.  (Pl.'s Ex. 115).

62.     Dassault provided a quote for repairs resulting from the September 5, 2013 incident.  The quote was given on September 30, 2013 and was for $215,570.00.  (Pl's Ex. 125).  Dassault's quote was based on providing new or overhauled parts.  These parts contain an original Dassault warranty.

63.     The Falcon did not require new or overhauled parts.

64.     The FAA only allows certified parts to be placed into aircraft.  Certified parts may either be new or serviceable used parts.

65.     It is the standard practice within the industry to replace airplane parts with serviceable used parts. To do otherwise would, at times, require an entity to request the manufacturer to create new parts made-to-order.

66.     Made-to-order parts can take eighteen to twenty-six weeks to be prepared.

67.     Vincent Antignani, who works for Dassault in its repair center, testified that Dassault needed to view the Falcon in person in order to create an estimate.

68.     Antignani sent an engineer and structural technician to evaluate the Falcon.

69.     These employees noted that the Falcon had issues that pre-dated the September 5, 2013, incident.  The issues included fuel leaks coming from incorrectly tightened screws.  Further, there were hydraulic leaks. These leaks had been present on the Falcon for some time and were safety issues.  The fuel leaks resulted from improper repairs.   The team observed no visual damage to the landing gear and no evidence of contact with the lower fuselage skin.  (Def's Ex. 17).

70.     There was testimony concerning non-destructive testing ("NDT") and how, if performed, it could reveal hidden defects.  NDT was never performed.

71.     There was no damage to the landing gear to the Falcon resulting from the September 5, 2013 impact.

72.     NDT needed to be performed on the Falcon after the September 5, 2013 incident.  A prospective purchaser would be concerned about purchasing the Falcon without having this type of testing performed.

73.     The damage sustained on September 5, 2013 was not sufficient to breach the skin of the plane in a manner that would allow outside weather into the interior of the plane.

74.     The damage that occurred on September 5, 2013 was to the vertical stabilizer of the Falcon.

75. The vertical stabilizer is a large structure on the Falcon and is made up of spars, ribs, and stressed internal skins. The vertical stabilizer is an important piece of the Falcon.

76. All wings and stabilizers on an aircraft have a leading edge, which separates the airflow around the wing or the stabilizer.

77. The impact did not cause significant damage to the Falcon. This is evidenced by the fact that

    a. The fastener rows were straight on the panel on the vertical stabilizer which indicates a lack of stress; and

    b. The deformation on the panel of the vertical stabilizer stopped before the fastener lines on the leading edge. This panel is a removable portion of the Falcon, and is secondary structure. The fact that the deformation did not reach the fastener lines indicates that the damage did not reach the spar and ribs of the leading edge.

78. An aircraft has to be maintained and inspected in order to be airworthy.

79. Failing to maintain an aircraft results in a loss in its value.

80. The Falcon's engines could have been run even after the September 5, 2013 incident.

81. Mid-South or its agent, Renaissance, failed to maintain the Falcon after the accident by

    a. Failing to run or preserve the engines, including but not limited to failing to comply with the Honeywell light maintenance manual;

    b. Failing to cover or "plug" the engines. Covering the engines is a basic maintenance requirement that prevents corrosion; and

    c. Failing to replace the seals. Failing to replace the seals results in dry rot and allows leakage, such as the leakage that came into the aircraft from the emergency exit door.

82.     Failing to maintain the Falcon resulted in significant depreciation of its value.

83.     Estimates were provided from four different companies as to the cost to repair the Falcon. SFS obtained estimates from Dassault Falcon and Standard Aero.  Mid-South obtained estimates from Straight Flight and Air Services, Inc.

84.     As stated earlier, the jet's manufacturer, Dassault Falcon, estimated that the cost of repair would be $215,570.00.

85.     On October 24, 2013, Standard Aero provided an estimate for $213,350.00.  (Pl.'s Ex. 116).  This estimate was later superseded on November 18, 2013.  The amount was reduced to $126,825.00 after Standard Aero was provided with an updated parts list.  (Def's Ex. 11a). Standard Aero also provided an April 4, 2014 estimate of $125,825.00.  (Def.'s Ex. 11b).
  The price contemplated work performed at the SFS' hangar.

86.     On October 2, 2013, Straight Flight provided an estimate to perform the repairs for $124,871.00.  (Def. Ex. 13).  This inspection was based on photos provided, but Straight Flight stated that there was a limited risk of hidden damage.  The price included temporary repairs onsite and a "ferry flight" for final repairs.

87.     On October 10, 2013, Air Services, Inc. provided an estimate to perform the repairs for $99,840.00. Air Services would have performed the repair at SFS. (Def. Ex. 12).

88.     After September 5, 2013, Mid-South stopped paying the $1,800 monthly fee.  The plane remained in SFS' hangar until March 3, 2014.

89.     Accordingly, Mid-South accrued $9,000.00 of unpaid hangar fees.

90.     On March 3, 2014, SFS informed Clark/Renaissance air that it was moving the Falcon to the tarmac.  Neither Mid-South nor Clark/Renaissance consented to the removal of the Falcon.

91.     The Falcon was placed on the tarmac on March 3, 2014 and remained there until April 2016.

92.     After March 3, 2014, SFS billed Mid-South $250.00 per month to store the Falcon on the tarmac, which is outdoors.

93.     Mid-South never agreed to pay $250.00 a month to store the Falcon on the tarmac.

94.     Mid-South never paid a $250.00 invoice to store the Falcon on the tarmac.

95.     On April 16, 2016, Phoenix Aircraft Rising ("Phoenix") began performing maintenance for the purpose of obtaining a ferry permit.

96.     Phoenix's logbook reports various repairs performed on the Falcon.  The portion called "Ch. 55 Stabilizers" refers to the damaged portion of the aircraft resulting from the September 5, 2013 incident.

97.     Phoenix's logbook indicates that it "[r]emoved damaged vertical leading edges, (2 sections).  Inspected vertical fin forward spar and surrounding structure for damage.  No other damage noted.  Installed serviceable leading edges, (2 sections)."  The following portion of the logbook indicates that the work was performed in accordance with the Falcon's manual.  The logbook indicated that the Falcon's vertical stabilizers were returned to service.

98.     The Invoice generated by Phoenix's logbooks reflects that the two damaged parts installed were "loaner parts."  Phoenix charged $93,000.00 for its services in a generic invoice that does not separate parts from labor.  If this invoice is taken to imply that "loaner" parts will be removed and other parts will have to be purchased to be permanently installed, it is a deviation from the other non-Dassault repair estimates and unreasonable for purposes of consideration of damages.

99.     The FAA requires a Form 337 to be completed when a "major" damage repair or alteration is performed on an aircraft.  The demarcation between major and minor repairs is clear under the

FAA.  In fact, a Form 337 is required to be completed within 48 hours.  If a Form 337 is not completed within 48 hours, a $10,000 fine may be imposed.

100.    A Form 337 was not completed for the repairs performed by Phoenix.

101.    In order to obtain a ferry permit, one must provide the reason why the aircraft is not airworthy.  The sole reason given in the ferry permit for the Falcon's flight was to obtain a C Check.  Vertical stabilizer issues were not mentioned.

102.    On February 23, 2016, Defendant filed a lien on the Falcon for the sum of $15,000.00 in Iredell County.  This lien complied with the requirements of N.C. Gen. Stat. § 44A-60.  (Def. Ex. 15).

EXPERT TESTIMONY

103.    Plaintiff offered Alan Fielder as an expert to testify as to the extent of damage, scope of repair, and appropriateness of materials for repair.  He has an A&P certificate issued by the FAA.

104.    Fielder's opinions in this case are not as credible as the Defendants' experts because

      a.      He has not repaired aircraft other than his own since the 1980s;

      b.      He has not worked at a repair station or fixed base operator since the 1980s; and

      c.      He does not have an inspection authorization ("IA").

105.    Sammy Bereznak of Air Services, Inc. testified as an expert.  He is certified by the FAA as an A&P with further certification of Inspection Authorization ("IA") for inspection compliance.

106.    The Court finds that Bereznak is a credible witness because of his extensive training, advanced certification, and experience in the maintenance, inspection, and operation of aircraft.  He has extensive experience inspecting aircraft like the Falcon.  His company, Air Services, holds

class one, two, and three unlimited repair station licenses from the FAA. Only six repair stations in the country have these classifications.

107.     The Court also finds that Bereznak's opinions regarding the cost to repair the Falcon were credible. His prior estimate to repair the Falcon was dictated by his desire to make a profit on the repair but also had to be low enough for his company to remain competitive. Accordingly, the price quoted was reasonable. Moreover, his opinion regarding the reasonableness of the price quotes from Standard Aero and Straight Flight are also afforded great weight because he is concurring with his competitors.

108.     John Henderson testified as an expert regarding aircraft appraisal. His testimony was partially credible.

109.     It is significant that the aircraft had not been flown or run since May 15, 2013. A significant amount of the value of an aircraft is tied to whether it is deemed airworthy, meaning that it has been kept in compliance with required inspections.

110.     Henderson testified that he based his appraisal, in part, on the Aircraft Bluebook Price Digest (the "Bluebook"). The Bluebook determines the value of aircraft by reference to aircraft transactions, including refinancing and sales. The Bluebook has at least two methods for valuing aircraft. On direct Henderson testified that he uses retail value when markets are strong and supply is short. However, on cross he admitted that the definition of "average retail value" is the retail market price for an average mid time used aircraft. Henderson's use of wholesale value appears to be at odds with both the Bluebook's method for valuing transactions and the definition of retail value in that he is discounting the retail price to the wholesale price when the Bluebook's method of recording transactions would presumably record the dip in prices.

111.    Accordingly, Henderson's starting point of $864,000.00 for an average Falcon, which assumes that the paint and interior is at a high value (90% of new), the airplane has no damage history, all inspections are up to date and current at half-life, and has average avionics and equipment, is rejected.

112.    An average Dassault Falcon of like year would be closer to $1,050,000.00.

113.    Henderson testified that he would deduct $400,000 from the starting value for "Airframe/Engine Maintenance" Items.  On direct he stated this was just to perform the required inspections.  He admitted that the bulk of this would be to perform the C Check required.  He also said that many buyers would be deterred from purchasing an aircraft without these inspections because of the substantial risk of needed latent repairs involved.  On cross, he stated that this figure included the repairs the inspection would uncover.  Henderson testified that a C Check would be $100,000.00.  Henderson was not provided with the $83,500.00 Carolina Aviation Technical Services ("CATS") estimate for performing a C Check on the Falcon and testified that that such an inspection would run much higher.  However, CATS had no motive to undervalue the amount it quoted.  Henderson's opinion regarding the cost for this deduction is therefore inflated.  The fact that a buyer would be deterred from purchasing an aircraft without this inspection justifies a deduction that exceeds the price to perform the inspection.  Accordingly, a deduction in the amount of $200,000.00 is warranted.

114.    The paint and interior appeared dated in September 2013, and, therefore was not at the 90% of new rate specified in the appraisal of an average Falcon.  Accordingly, Henderson's deduction in the amount of $155,000.00 is warranted.

115.    The value of the Falcon on September 4, 2013 was $695,000.00.

116.    Henderson testified that the normal method for deducting value in an aircraft after damage occurs is to take 15% off the retail price pre-damage. Henderson's evaluative method does not take into consideration the cost to repair the subject aircraft. Henderson stated that he did so in this case and came up with a $262,000.00 cost figure. Using Henderson's methodology, he would arrive at a $262,650.00 figure. Henderson's testimony contradicts his expert report, which states that he came up with this figure by using the Air Services quote. Henderson's calculations in his report make it clear that he went through the Air Services quote and deducted line entries one through six and line entry ten.[5] This serves as an additional basis for questioning Henderson's overall credibility regarding the figures he used.

117.    Utilizing Henderson's percentage method for devaluing an aircraft post-accident, the value of the Falcon was $590,750.00 on September 6, 2013. Accordingly, the diminution in value if Henderson's percentage method is used would be $104,250.00. This is pertinent evidence the Court considered in determining the Falcon's actual value after the September 5, 2014 incident.

118.    The average of the three non-manufacturer quotes was $117,012.00.[6] The cost to perform a reasonable repair, which did not include hidden costs related to non-destructive testing, ranged from $126,825.00 to $99,840.00. This is pertinent evidence the Court considered in determining the differentiation in the value of the Falcon before and after the September 5, 2014 incident.

119.    After considering all of the evidence, including the expert opinions and repair estimates, the Court finds that the value of the Falcon on September 6, 2013 was $583,000.00

120.    The difference between the market value of the Falcon immediately before and after the September 5, 2014 impact is $112,000.00.

---

[5] The term "line entry" references the total amount charged for each of the ten itemized descriptions.
[6] In determining this figure, the Court averaged the two Standard Aero estimates (of $126,825 and $125,825) to $126,325.

121.    The value of the Falcon on September 1, 2015 was $75,000. The reduction in value from September 6, 2013 resulted from the Mid-South's failure to maintain the Falcon.[7]


## CONCLUSIONS OF LAW

1.    Mid-South has the burden of proof to show that a bailment relationship exists. "[A] bailment is created upon the delivery of possession of goods and the acceptance of their delivery by the bailee." *Atl. Contracting & Material Co. v. Adcock*, 588 S.E.2d 36, 39-40 (N.C. App. 2003) (quoting *Flexlon Fabrics*, 250 S.E.2d at 726).

2.    In order to "deliver" an item, the bailor must "relinquish[] exclusive possession, custody, and control to the bailee." *Id.* (quoting *Flexlon*, 250 S.E.2d at 726).

3.    A delivery of property for storage purposes provides evidence of a bailment, but that alone is not sufficient. *Id.* "The critical question is the degree of control exercised by [the purported bailee] over [the purported bailor's property]." *Id.* at 40.

4.    Mid-South did not prove that a bailment relationship existed. The purported bailee, SFS, never had exclusive possession, custody, and control of the Falcon.

5.    SFS admits that it is liable for the damages caused to the Falcon when it undertook to tow the Falcon on September 5, 2013. (Doc. 13); (Doc. 22); *Birtha v. Stonemor, N. Carolina, LLC*, 727 S.E.2d 1, 6 (N.C. Ct. App. 2012) (specifying how to prove a negligence claim).

6.    Mid-South and SFS' principle dispute is the scope of damages.

7.    Mid-South is limited to the recovering the difference between the fair market value of the Falcon before the September 5, 2013 incident and the fair market value of the Falcon after the September 5, 2013 incident, which is $112,000.00.

---

[7] The Court's method for determining the value of the Falcon can be seen on Appendix A.

a. The general rule in North Carolina regarding damages to personal property is that a plaintiff is permitted "the difference between the market value of the damaged property *immediately before and immediately after the injury.*" *Smith v. White*, 712 S.E.2d 717, 720 (N.C. Ct. App. 2011) (quoting *Light Co. v. Paul*, 261 N.C. 710, 710-11 (1964)); *Sprinkle v. N.C. Wildlife Res. Comm'n*, 600 S.E.2d 473, 476 (N.C. Ct. App. 2004). Cost of repair is pertinent evidence regarding this difference. *Smith*, 712 S.E.2d at 720-21; *Sprinkle*, 600 S.E.2d at 577.

b. Even though this Court holds that Mid-South failed to establish a bailment, it also holds in the alternative that, supposing a bailment to exist, the damages that occurred to the Falcon after the September 5, 2013 impact were caused by Mid-South's contributory negligence and failure to mitigate.

c. SFS did not proximately cause the damages occurring after the September 5, 2013 incident. These damages were proximately caused by the Mid-South in failing to maintain the Falcon.

8. SFS has the burden to prove its counterclaim for breach of contract. SFS therefore must prove "existence of a valid contract and (2) breach of the terms of that contract." *Schlieper v. Johnson*, 672 S.E.2d 548, 553 (N.C. Ct. App. 2009) (quoting *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000)).

9. "A contract, express or implied, requires assent, mutuality, and definite terms." *Id.*

10. Defendant/Counter-claimant SFS has proven that a contract existed for a monthly payment of $1,800.00 for a space in the hangar for the Falcon. Mid-South's failure to remit payment from the time period of September 5, 2013 to March 3, 2014 constituted a breach of the agreement.

11.     SFS's proposal to move the Falcon and invoice for monthly charges of $250.00 constituted offers to modify the contract.

12.     A modification "must contain all the essential elements of a contract." *Yamaha Int'l Corp. v. Parks*, 325 S.E.2d 55, 58 (N.C. Ct. App. 1985). These elements are "mutual assent to the modification, and consideration or a substitute supporting it." *Altman v. Munns*, 345 S.E.2d 419, 422 (N.C. Ct. App. 1986). The requisite mutual assent can be shown by an express affirmative statement or "conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived." *Son-Shine Grading, Inc. v. ADC Const. Co.*, 315 S.E.2d 346, 349 (N.C. Ct. App. 1984). "Silence and inaction do not amount to an acceptance of an offer." *Adams v. State Capital Life Ins. Co.*, 182 S.E.2d 250, 251 (N.C. Ct. App. 1971).

13.     "The general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further." *Williams v. Habul*, 724 S.E.2d 104, 112 (N.C. Ct. App. 2012) (quoting *Coleman v. Shirlen*, 281 S.E.2d 431, 434 (N.C. Ct. App. 1981). "However, '[f]ailure to perform an independent promise does not excuse nonperformance on the part of the other party.'" *Id.* (quoting *Coleman*, 281 S.E.2d at 434).

14.     "Whether a breach is material or immaterial is ordinarily a question of fact." *McClure Lumber Co. v. Helmsman Const., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (N.C. Ct. App. 2003)

15.     The parties stipulate that SFS charged $250.00 per month to store the aircraft outside from March 3, 2014 to March 31, 2016 for storage on the tarmac. (Doc. 67, at ¶ 11).

16.     The $250.00 invoices do not amount to a contract, but rather an offer.  Further, the email exchange only indicates that SFS would move the Falcon and does not even indicate that a price term was discussed or offered.

17.     There is no evidence of mutual assent to the modification. [the only evidence of assent would be leaving the Falcon on the tarmac for around two years.]  Accordingly, a modification did not occur.

18.     The original contract, however, terminated after SFS moved the aircraft onto the tarmac because SFS no longer had a duty to hangar the Falcon due to Mid-South's material breach of failing to pay for that period of time.

19.     Defendant has failed to meet its burden to prove that a valid contract existed to store the Falcon on the tarmac beginning March 3, 2014.  This was the period during which the repair issue dispute simmered.  At best, the evidence showed that Defendant offered to store the aircraft on the tarmac; however, the Court finds that no acceptance occurred.

20.     The undersigned concludes that Plaintiff owes $9,000.00 as a result of the breach of the agreement, plus pre-judgment interest at 8% per annum.  N.C. Gen. Stat. § 24-5(a); *Cleveland Const., Inc. v. Ellis-Don Const. Inc.*, 709 S.E.2d 512, 524 (N.C. Ct. App. 2011).

21.     The undersigned concludes that Defendant has a valid lien on the Falcon for $9,000, which is the contract price, pursuant to N.C. Gen. Stat. § 44A-55, -66.  After Defendant moved the Falcon onto the tarmac, there was no contract, therefore, Defendant could not have a lien for the contract price.  Moreover, Defendant is not entitled to a lien for the "reasonable worth" of the storage because, after the movement of the aircraft, storage was no longer "at the request" of Plaintiff. N.C. Gen. Stat. § 44A-55.

**IT IS, THEREFORE, ORDERED THAT**:

(1) Plaintiff MID-SOUTH INVESTMENTS, LLC is entitled to judgment against Defendant STATESVILLE FLYING SERVICE, INC. in the amount of $112,000.00 with interest running from the date of filing, November 10, 2014, at the rate prescribed by N.C. Gen. Stat. § 24-5(b);

(2) Defendant STATESVILLE FLYING SERVICE, INC. is entitled to $9,000.00 in compensatory damages with pre-judgment interest running from the date of the breach at the statutory rate prescribed by N.C. Gen. Stat. § 24-5(a) as follows:[8]

    a. Interest from the failure to pay the September 30, 2013 $1,800.00 invoice runs from October 10, 2013;

    b. Interest from the failure to pay the October 31, 2013 $1,800.00 invoice runs from November 10, 2013;

    c. Interest from the failure to pay the November 30, 2013 $1,800 invoice runs from December 10, 2013;

    d. Interest from the failure to pay the December 31, 2013 $1,800 invoice runs from January 10, 2014; and

    e. Interest from the failure to pay the January 31, 2014 $1,800 invoice runs from February 10, 2014; and

(3) Defendant has a valid lien on the Falcon under N.C. Gen. Stat. § 44A-55(A) for $9,000; and

(4) Post-judgment interest for both parties is the rate specified by 28 U.S.C. § 1961.

---

[8] *Interstate Equip. Co. v. Smith*, 234 S.E.2d 599, 605 (N.C. 1977) (specifying that the interest runs from the "date on which each rental payment became due.").

Signed: July 22, 2016

Richard L. Voorhees
United States District Judge

## APPENDIX A

| Description | Value | Paragraph Number |
|---|---|---|
| Henderson's Opinion of Value of "Average" Falcon at wholesale | $864,000.00 | ¶¶ 110-111 |
| Henderson's Opinion of Value of "Average" Falcon is rejected because it appears inconsistent with Bluebook and his opinion, as a whole, appears to devalue the Falcon. Retail price is substituted for wholesale price. | $1,050,000.00 | ¶¶110 – 112; *see also* ¶¶ 113, 116. |
| Deductions from "Average" Falcon to account for outstanding issues with the Falcon. Henderson's estimate for a 400,000.00 deduction based on overdue inspections is rejected, in part, because of his testimony indicating that it is primarily based upon the outstanding C Check. | $200,000.00 | ¶ 113. |
| Deductions from "Average" Falcon to account for below-average condition of interior of airplane and paint. | $155,000.00 | ¶ 114 |
| Value of Falcon on September 4, 2014. | $695,000.00 | ¶ 112 subtracted by ¶¶ 113-114 = ¶ 115 |
| Value of Falcon on September 6, 2014 utilizing Henderson's 15% discount method | $590,750.00 | ¶ 115 multiplied by .85 |
| Diminution in Value Due to September 5, 2014 accident utilizing Henderson's 15% discount method | $104,250.00 | ¶ 115 subtracted by ¶ 117 |
| Average of Non-Manufacturer Quotes | $117,012.00 | (¶ 85 + ¶ 86 + ¶ 87) divided by 3 = ¶ 118 |
| Range for Reasonable Repair Costs, excluding non-destructive testing | $126,825.00 to $99,840.00 | ¶ 118 |

| | | |
|---|---|---|
| Court's determination of value of Falcon on September 6, 2014 | $583,000.00 | ¶ 119 |
| Court's determination of difference in market value of the Falcon immediately before and after the September 5, 2014 incident | $112,000.00 | ¶ 120 |